UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ESTHER GUTREJMAN,

*Plaintiff*,

v.

UNITED STATES OF AMERICA,

*Defendant.*

Civil Action No. 20-266 (RDM)

## MEMORANDUM OPINION AND ORDER

In 2014, the United States and France executed an Agreement on Compensation for Certain Victims of Holocaust-Related Deportation from France Who Are not Covered by French Programs (the "Agreement"). Dkt. 12-2 at 5. Under the Agreement, France provided $60 million for a compensation fund (the "Fund") to be administered by the Department of State (the "Department"), which would provide benefits to individuals who were deported from France to concentration camps during the Holocaust, as well as those individuals' eligible family members. In return, the United States agreed to ask domestic courts to dismiss any lawsuits against the French government and the state-owned entity responsible for the transportation.

Albert Gutrejman, whose mother was deported from France and died at Auschwitz, filed a claim with the Department pursuant to the Agreement. The Department denied the claim. Esther Gutrejman, Albert Gutrejman's surviving wife, then filed this lawsuit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, alleging that the Department negligently rejected Albert Gutrejman's claim. Pending before the Court is the United States' motion to dismiss on the ground that Plaintiff's claim falls outside the scope of the FTCA's limited wavier of sovereign immunity. Dkt. 12. Because the FTCA waives sovereign

1

immunity only where state law would make a private person liable in tort, and because Plaintiff has not shown a state-law analogue for the tort she alleges, the Court will dismiss Plaintiff's complaint. The Court will, however, give Plaintiff an opportunity to file an amended complaint that repleads her claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

## I. BACKGROUND

In 2014, the United States and France signed the Agreement to establish a compensation fund for holocaust victims who were deported from France to concentration camps. Dkt. 1 at 2 (Compl. ¶¶ 1–2); Dkt. 12-2. In recognition of France's "responsibility in the process of deportation of [Holocaust] victims and an imprescriptible debt toward them," Dkt. 12-2 at 6, the Agreement aimed to create "an exclusive mechanism for compensating persons who survived deportation from France, their surviving spouses, or their assigns," if those victims were not already eligible for existing compensation programs, *id.* at 8 (Agreement § 2.1). Under the Agreement, France paid $60 million to the United States to establish the Fund. *Id.* at 9 (Agreement § 4.1). In exchange, the United States agreed to "secure, with the assistance of the Government of [France] if need be, at the earliest possible date, the termination of any pending suits or future suits that may be filed in any court at any level of the United States legal system against France concerning any Holocaust deportation claim." *Id.* at 10 (Agreement § 5.2).

Based on the terms of the Agreement, eligible beneficiaries of the Fund "are the actual survivors of trains which deported victims from France to concentration camps such as Auschwitz or Buchenwald, or their surviving spouses." Dkt. 1 at 2 (Compl. ¶ 2); *see also* Dkt. 12-2 at 8 (Agreement § 2.1). If either the Holocaust survivor or the surviving spouse died after 1948, then their children, as assigns, are eligible to make a claim. Dkt. 1 at 2 (Compl. ¶ 2). The Agreement further provides, however, that neither French nationals, Dkt. 12-2 at 8 (Agreement

2

§ 3.1), nor beneficiaries of any other program designed to compensate victims of Holocaust deportation, *id.* at 8–9, are eligible to receive compensation from the Fund. Attached to the Agreement as an Annex is a "Form of Written Undertaking" that applicants to the Fund must execute. *Id.* at 14–15 (Agreement Annex). The applicant must provide "documentation establishing nationality" and "declare under penalty of perjury" that she has not received (and will not receive) compensation from any other program related to Holocaust deportation. *Id.* Beyond those restrictions, the Agreement gives the United States the "sole discretion" to distribute the funds "according to criteria which it shall determine unilaterally." *Id.* at 11 (Agreement § 6.1).

In 2016, Albert Gutrejman, who is now deceased, filed a claim with the Department. Dkt. 1 at 2 (Compl. ¶ 1). Albert Gutrejman's mother, "Estera[,] was deported from France on September 18, 1942 and died at Auschwitz." *Id.* (Compl. ¶ 3). Albert Gutrejman's stepfather, Henri Gutrejman, who would have been eligible to make a claim under the Fund, died in 1976. *Id.* Albert Gutrejman thus filed his claim as the sole heir of Henri Gutrejman. *Id.* As part of his claim, Albert Gutrejman provided a sworn affidavit that his stepfather was Romanian (and, thus, not French) and was married to his mother. *Id.* at 5 (Compl. ¶ 15).

The Department rejected Albert Gutrejman's claim, finding that he was ineligible because he had provided insufficient evidence of his stepfather's nationality. *Id.* (Compl. ¶ 14). Albert Gutrejman then provided an additional affidavit attesting that his stepfather was Romanian and died in 1976, but that he did not have a copy of his stepfather's death certificate. *Id.* (Compl. ¶ 16). In a third affidavit, he attested that, as a child, he had attended the wedding of his mother and stepfather by Rabbi Pinkus in Paris, and, in a fourth affidavit, his counsel attested that she had searched for "evidence of the marriage, but that after the destruction of World War

3

II and the passing of more than 79 years, no such documents could be found." *Id.* (Compl. ¶ 17–18). In rejecting Albert Gutrejman's claim, the Department did not assert that Henri Gutrejman was a citizen of France, only that Albert Gutrejman had failed to provide adequate proof of Henri Gutrejman's nationality. *Id.* at 5–6 (Compl. ¶¶ 14, 20).

On January 31, 2020, Plaintiff Esther Gutrejman, as trustee of Albert Gutrejman's estate, filed this lawsuit against the United States. Dkt. 1. The complaint alleges that the Department's rejection of Albert Gutrejman's claim was "a wrongful act." *Id.* at 6 (Compl. ¶ 23). The United States moves to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). Dkt. 12. Plaintiff filed her opposition to the motion, Dkt. 14; the United States filed its reply, Dkt. 16; Plaintiff then filed a sur-reply brief, Dkt. 18; and, finally, the United States filed a notice of supplemental authority on March 8, 2021, Dkt. 19. The motion to dismiss is now fully briefed and ripe for decision.

## II.  LEGAL STANDARD

Federal courts are courts of limited subject-matter jurisdiction that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of an action for lack of subject-matter jurisdiction. When a defendant files a motion to dismiss for lack of subject-matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction. *Id.*; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Where, as here, a defendant contends that the jurisdictional allegations in the complaint are inadequate, the Court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor" but does not "assume the truth of legal conclusions." *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (internal quotation marks omitted). In this sense, the Court

must resolve the motion in a manner similar to a motion to dismiss under Rule 12(b)(6).  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

### III.  DISCUSSION

Under the doctrine of sovereign immunity, the United States may not be sued without its consent.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Waivers of sovereign immunity must be "'unequivocally expressed'" and "'strictly construed, in terms of [their] scope, in favor of the sovereign.'"  *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) (quoting *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999)).  Plaintiff's claim is predicated on the limited waiver of sovereign immunity contained in the FTCA.  *See United States v. Orleans*, 425 U.S. 807, 813 (1976).  The scope of the waiver of sovereign immunity under the FTCA is "coextensive" with the Court's subject-matter jurisdiction.  *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 512 (D.C. Cir. 2009); *see Lehman v. Nakshian*, 453 U.S. 156, 160 (1981).  The party bringing the suit "bears the burden of proving that the government has unequivocally waived its immunity."  *Tri-State Hosp. Supply*, 341 F.3d at 575.

The FTCA permits tort suits for "money damages" against the United States by those who suffer "injury . . . caused by the negligent or wrongful act or omission of any employee of the [g]overnment while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1).  The waiver of sovereign immunity extends, however, only to those "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  *Id.*  Sovereign immunity is thus waived only under circumstances where local law would make a private person liable in tort. *United States v. Olson*, 546 U.S. 43, 44 (2005) (internal quotation marks omitted).  The Court

must, accordingly, consider whether Plaintiff's claim is "analogous" to a claim arising "under local tort law," *Hornbeck Offshore Transp.*, 569 F.3d at 510 (internal quotation marks omitted)—here, the law of the District of Columbia.

The United States argues that the Court lacks subject-matter jurisdiction over Plaintiff's claim because there is no tort under D.C. law that is analogous to the allegedly unlawful administration of a fund created by an international agreement. Dkt. 12-1 at 3. The government contends that Plaintiff's claims lack a private analogue for two reasons. First, the complaint fails to allege a tort analogous to a private tort because, inherently, "any alleged duties created by an international agreement are not predicated on state law as the FTCA requires." *Id.* at 5. Second, Plaintiff has not alleged facts that, if asserted against a private party, would state a claim for negligence under D.C. law. *Id.* at 4; Dkt. 16 at 3.[1] In her opposition, Plaintiff asserts that her complaint alleges that the Department performed "negligently, wrongly, and capriciously" when rejecting her late husband's claim. Dkt. 14 at 3.

It is well-established "that the violation of a federal statute or regulation by government officials does not of itself create a cause of action under the FTCA" and that a plaintiff who "bas[es] [her] negligence claim entirely on violation of federal duties . . . fails to consider that the FTCA waives the immunity of the United States only to the extent that a private person in like circumstances could be found liable in tort under *local* law." *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157 (D.C. Cir. 1985) (emphasis added). As such, when a plaintiff premises her FTCA claim on the violation of a federal statute (or, as here, an international

---

[1] In the alternative, the government argues that, even if such a private analogue did exist, the claim would fall under the discretionary function exception to the FTCA. Dkt. 12-1 at 3; *see also* 28 U.S.C. § 2680(a). Because the Court concludes that Plaintiff has failed to demonstrate that a private analogue for her claim exists under D.C. law, the Court need not reach this alternative argument about the discretionary function exception.

agreement), "[t]he pertinent inquiry is whether the duties set forth in the federal law are analogous to those imposed under local tort law," *id.* at 1158; *see also FDIC*, 510 U.S. at 477.  In *Art Metal*, for example, the D.C. Circuit affirmed the dismissal of an FTCA negligence suit brought by an office-furniture supplier against the United States, after the government declined to award the company several contracts even though the company was the lowest bidder.  753 F.2d at 1153.  The Court concluded that there was no analogous local tort claim for such a dispute between the buyer and seller of goods.  *Id.* at 1160–61.  Similarly, in *Hornbeck Offshore*, the D.C. Circuit affirmed the dismissal of an FTCA claim against the U.S. Coast Guard for assigning the wrong "phase-out" date to an oil barge because the alleged violation was premised exclusively on a federal statute, and local tort law would provide no relief in the absence of the duty created by federal law.  569 F.3d at 509–10.  The D.C. Circuit held that "[w]here a claim is wholly grounded on a duty created by a federal statute such that there is no local law that could support liability of a private party for similar actions, the FTCA does not apply."  *Id.* at 510 (internal quotation marks omitted).

Here, Plaintiff claims that the Department "wrongfully" rejected her husband's claim for compensation.  Dkt. 14 at 5.  But, as Plaintiff seems to acknowledge, the Department's duty, if any, to pay the claim arose exclusively from federal law.  *See*, *e.g.*, *id.* (Plaintiff's opposition brief referring to the "duties undertaken by [the Department] under the Agreement").  Unsurprisingly, Plaintiff fails to identify any D.C. law imposing liability on a private party for tortious administration of a benefits program created by international accord.  Nor does she maintain that, in executing the Agreement, the United States assumed any duties under local tort law.  *See Art Metal*, 753 F.2d at 1159 n.15 (noting the difference between federal statutes that create "federal legal duties" and statutes that suggest "the government has assumed duties under

7

local tort law"). Plaintiff thus impermissibly predicates her FTCA claim exclusively on a unique federal duty. *See Hornbeck Offshore*, 569 F.3d at 512.

The Court is unpersuaded by any of Plaintiff's efforts to avoid this conclusion. First, she attempts to distinguish *Hornbeck Offshore*, on which the government relies, by asserting that the Department's adjudication of claims from Holocaust survivors under the Fund is not the sort of "highly technical regulatory agency conduct" under a "complex federal regulatory scheme" that was at issue in that case. Dkt. 14 at 5. But *Hornbeck Offshore* did not turn on whether the federal claim in question arose under a complex regulatory scheme—all that mattered was that the basis for the claim was "a federal statute, not any state or local law." 569 F.3d at 509.

Plaintiff is on slightly firmer ground in arguing that a private analogue can be found in the common law of negligence, but that contention ultimately fails as well. According to Plaintiff, her claim is analogous to local tort law because the duty the Department owed her husband is akin to the duty owed by a private claims administrator to a claimant. Dkt. 14 at 5–6 (referring to the administration of the Fund as the "routine work of a claims administrator"). To the extent Plaintiff contends that an FTCA claim does not have to exist "entirely independently" from a federal statute, she is correct. *Hornbeck Offshore*, 569 F.3d at 510. An act of negligence in administering a federal duty can form the basis of an FTCA claim, but only if that same negligent act would be actionable under local law if committed by a private party. *See Indian Towing Co. v. United States*, 350 U.S. 61, 68–69 (1955) (holding that the United States could be held liable under the FTCA for negligence when, while operating a lighthouse, the Coast Guard allowed a light bulb to go out and negligently failed to check on it for approximately a month).

To state a claim for negligence under D.C. law, a complaint must specify the negligent act and describe the duty that was breached. *See District of Columbia v. White,* 442 A.2d 159,

8

162 (D.C. 1982) (citing *Kelton v. District of Columbia,* 413 A.2d 919, 922 (D.C. 1980)). Plaintiffs must establish "that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1098 (D.C. 1994); *see also Childs v. Purll*, 882 A.2d 227, 233 (D.C. 2005) (explaining that "the plaintiff must establish a duty of care, a deviation from that duty, and a causal relationship between that deviation and an injury sustained by the plaintiff" (internal quotation marks omitted)).

The problem with Plaintiff's argument is that she fails to identify a duty under D.C. tort law that is analogous to the proper administration of a fund established by international agreement between two sovereign states or any other analogous duty of care that the Department owed to her or her husband under D.C. law. To the extent that Plaintiff relies on the Agreement to establish the duty—by alleging that the Department's "wrongful act" was its failure to credit her husband's affidavits—D.C. law precludes tort liability based on failure to comply with a duty that arises from a contract. As the D.C. Court of Appeals has held, "the tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship." *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008). That same logic applies with equal force to claims premised on a third-party-beneficiary theory of liability. *See Dun v. Transamerica Premier Life Ins. Co.*, 442 F. Supp. 3d 229, 240 (D.D.C. 2020) (citing *Whiting v. AARP*, 637 F.3d 355, 363 (D.C. Cir. 2011)). The breach of a duty arising from a contract thus cannot form the basis for tort liability under D.C. law and, therefore, it also cannot serve as the predicate for liability under the FTCA.

The economic loss doctrine also forecloses Plaintiff's claim.[2]  Under D.C. law, the economic loss doctrine bars recovery "of purely economic losses in negligence, subject to only one limited exception where a special relationship exists."  *Aguilar v. RP MPR Wash. Harbour LLC*, 98 A.3d 979, 985–86 (D.C. 2014).  Where a "special relationship" exists, an independent duty of care is owed.  *See Whitt v. Am. Prop. Const., P.C.*, 157 A.3d 196, 205 (D.C. 2017).  Plaintiff argues that such a "special relationship" exists between claims administrators and claimants.  Dkt. 18 at 2–4.  And, because the Department was acting in a role analogous to that of a private claims administrator when adjudicating Albert Gutrejman's claim, the Department, Plaintiff argues, owed Albert Gutrejman a duty of care based on that special relationship.  Dkt. 18 at 2–4.

But Plaintiff fails to allege the existence of such a special relationship.  She alleges no facts and offers no reasoning to support the notion that claims administrators and claimants have a special relationship.  She rests, instead, on the conclusory assertion that "[a]s claims administrator, the Department owes a duty of care to the claimants with whom it has a special relationship."  *Id.* at 4.  But D.C. law does not support the assertion that there is a special relationship between private claims administrators and potential beneficiaries.  *See, e.g., Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 798, 812 n.39 (D.C. 2011) (en banc) (special relationships include relationships involving "(1) carrier-passenger, (2) innkeeper-guest, (3) invitor-invitee or possessor of land open to the public and one lawfully upon the premises; (4) employer-employee, (5) school-student, (6) landlord-tenant, and (7) custodian-ward") (citing

---

[2] Plaintiff seeks "the full amount that would otherwise be paid to her from the [Fund] had the claim initially been approved," which amounts to $81,361, to "be paid from the Fund or, if the Fund assets are insufficient, from funds of State or the U.S. Treasury."  Dkt. 1 at 7 (Compl. Prayer for Relief).  She alleges no other injuries aside from the loss of the money owed to her from the Fund, and her alleged loss is thus purely economic.

Dan B. Dobbs, *Undertakings and Special Relationships in Claims for Negligent Infliction of Emotional Distress,* 50 Ariz. L. Rev. 49, 54 (2008)); *Vassiliades v. Garfinckel's*, 492 A.2d 580, 592–93 (D.C. 1985) (special relationships include "persons who occupy a fiduciary relationship" as they "must scrupulously honor the trust and confidence reposed in them because of that special relationship").  None of these categories of special relationships that the D.C. Court of Appeals has recognized comes close to encompassing the relationship between the Department and Plaintiff in this case, because Plaintiff fails allege a unique obligation on the part of the United States to ensure Plaintiff's economic well-being.  *See Aguilar*, 98 A.3d at 985.  Indeed, Plaintiff acknowledges that no case decided by the D.C. courts has recognized a tort based on a private claims administrator's negligence in settling claims.  Dkt. 18 at 2 n.1.  And, beyond that, she concedes that the one case she does cite—from the U.S. District Court for the Eastern District of Pennsylvania—merely allowed a claim against an administrator to go forward "without specific discussion regarding the negligence claim." *Id.* (citing *Oetting v. Heffler*, No. 11-cv-4757, 2015 WL 9190629 (E.D. Pa. 2015)); *see also Faktor v. United States*, No. 20-cv-263, 2021 WL 848686 at *4 n.6 (D.D.C. Mar. 4, 2021).  Plaintiff bears the burden of establishing subject-matter jurisdiction, yet she fails to identify any meaningful support for her theory of analogous liability under D.C. law.

Even if Plaintiff could identify a D.C. tort for negligent claims administration (which she cannot), and even if D.C. law recognized a fiduciary duty running from claims administrators to claimants that could establish a special relationship (which it does not), the Court would remain unconvinced that a federal program established pursuant to an international agreement, like that at issue here, is analogous to a private agreement to settle claims.  Some functions are so uniquely governmental that there is simply no sense in which the United States, "if a private

11

person," could perform a similar action, much less be held liable for negligent performance of it. 28 U.S.C. § 1346(b)(1). The President's authority to enter executive agreements with foreign states resolving claims of U.S. citizens is such a function, which goes back to the earliest days of the Republic and is a product of both congressional acquiescence and the President's foreign affairs power. *See Dames & Moore v. Regan*, 453 U.S. 654, 679–83 (1981) (discussing the historical practice of the United States "repeatedly exercis[ing] its sovereign authority to settle the claims of its nationals against foreign countries," including a "longstanding practice of settling such claims by executive agreement without the advice and consent of the Senate"); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) ("Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice," dating to "the early years of the Republic," with "the first example being as early as 1799"); *United States v. Pink*, 315 U.S. 203, 229 (1942) (referring to "settlement of claims of our nationals" as "a modest implied power of the President" necessary for "handling the delicate problems of foreign relations"). The exercise of that authority is not, by any stretch, analogous to the creation of a private claims-settlement process. And beyond that concern, a judicial decision that implies terms into an international executive agreement, including reading the agreement implicitly to create a duty of care owed by the United States to third parties, would at the very least raise a significant question of separation of powers.

For present purposes, however, it is sufficient for the Court to conclude that Plaintiff has failed to carry her burden of identifying a private analogue to the tort that she alleges. Her claim thus falls outside the FTCA's waiver of sovereign immunity. Confirming this conclusion, other judges in this district have recently dismissed nearly identical claims on the same grounds. *See Faktor*, 2021 WL 848686, at *6; *see also* Order, *Schneider v. United States*, No. 20-cv-260 (Dkt.

20) (D.D.C. Feb. 10, 2021).  The Court, will, accordingly, grant the United States' motion to dismiss.

Perhaps sensing the weakness of her FTCA claim, Plaintiff in her sur-reply "respectfully request[ed]" that, "[i]n the event this Court should find that the [c]omplaint falls short in any allegations required to state a negligence claim," she be given "the opportunity to amend [her] [c]omplaint to supplement these allegations and to include a cause of action under the [APA]." Dkt. 18 at 3 n.2.  The Court doubts the utility of supplementing Plaintiff's FTCA claim, but her claims against the Department would seem to fit more naturally under the APA.  The Court will thus grant Plaintiff leave to amend her complaint to present claims under the APA.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the United States' motion to dismiss, Dkt. 12, is **GRANTED** and that Plaintiff's complaint is **DISMISSED** without prejudice.  Plaintiff may file an amended complaint pleading claims under the APA on or before April 16, 2021.  If she fails to do so, the Court will enter final judgment in favor of the United States at that time.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: March 19, 2021