UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTHER GUTREJMAN,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>*Defendant.* | Civil Action No. 20-266 (RDM) |

## MEMORANDUM OPINION

This case concerns the Court's power to interpret and enforce an international agreement that, by its terms, commits disputes over its interpretation and enforcement to the exclusive province of diplomatic consultation. In 2014, the United States and the French Republic executed an agreement (the "Agreement") under which France would provide $60 million to the United States for a fund (the "Fund") to compensate individuals who were deported from France to concentration camps during the Holocaust, as well as their surviving spouses and their estates and representatives.[1] *See* Dkt. 23-2 at 9 (Agreement art. 4). In exchange, the United States agreed to seek the termination of any pending and future lawsuits filed against France in U.S. courts that raised claims related to Holocaust deportation. *Id.* at 10 (Agreement art. 5).

Plaintiff Esther Gutrejman, as trustee for the estate of her deceased husband Albert Gutrejman, challenges the State Department's denial of her husband's claim for compensation from the Fund. Plaintiff initially filed this lawsuit against the United States under the Federal

---

[1] *See* Agreement between the Government of the United States of America and the Government of the French Republic on Compensation for Certain Victims of Holocaust-Related Deportation from France Who Are not Covered by French Programs, Fr.-U.S., Dec. 8, 2014, T.I.A.S. No. 15-1101.

1

Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, alleging that the Department negligently rejected her husband's compensation claim. The Court dismissed Plaintiff's FTCA claim on the ground that it fell beyond the scope of the FTCA's limited waiver of sovereign immunity. *See* Dkt. 20 at 13. The Court, however, granted Plaintiff leave to amend her complaint to assert a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* Plaintiff filed her Amended Complaint on April 16, 2021, alleging that the Department's denial of her husband's claim was arbitrary and capricious in violation of the APA, 5 U.S.C. § 701 *et seq*. The Department now moves to dismiss Plaintiff's APA claim.

For the following reasons, the Court will **GRANT** the Department's motion and will **DISMISS** Plaintiff's Amended Complaint for lack of jurisdiction.

## I. BACKGROUND

On December 8, 2014, the United States and the French Republic entered into an executive agreement to establish a compensation fund for Holocaust victims who were deported from France to concentration camps. *See* Dkt. 21 at 1–2 (Compl. ¶¶ 1–2); Dkt. 23-2 (Agreement). Under the Agreement, France agreed to pay $60 million to the United States to establish the Fund. Dkt. 23-2 at 9 (Agreement art. 4 § 1). In exchange, the United States agreed to "secure, with the assistance of the Government of the French Republic if need be, at the earliest possible date, the termination of any pending suits or future suits that may be filed in any court at any level of the United States legal system against France concerning any Holocaust deportation claim." *Id.* at 10 (Agreement art. 5 § 2). The Agreement entered into force on November 1, 2015. *Id.* at 4.

One of the Agreement's stated objectives was to "[p]rovide an exclusive mechanism for compensating" individuals (1) who "survived deportation from France, their surviving spouses,

or their assigns" and (2) who are "not able to gain access to the pension program established by the French Republic for French nationals, or by international agreements concluded by the French Republic to address Holocaust deportation claims." *Id.* at 8 (Agreement art. 2 § 1). Consistent with that objective, the Agreement provides that French nationals are ineligible for compensation, *id.* at 8 (Agreement art. 3 § 1), as are beneficiaries of any other program designed to compensate victims of Holocaust deportation from France, *id.* at 8–9 (Agreement art. 3 §§ 2–4). Attached to the Agreement as an Annex is a "Form of Written Undertaking" that applicants for compensation must execute. *Id.* at 14–15 (Agreement Annex). The Form requires applicants to declare their nationality and to attach "a copy of government documentation establishing [that] nationality." *Id.* at 14. The Form also requires applicants to "declare under penalty of perjury" that they have not received—and will not receive—compensation from any other program related to Holocaust deportation. *Id.* at 15 (Agreement Annex §§ 5–6). In addition to requiring that applicants execute the Form, the Agreement provides that the United States and France "shall exchange information helpful to implementation of this Agreement, including information required to ensure that no claimant receives an inadmissible payment." *Id.* at 12 (Agreement art. 6 § 6).

Under the Agreement, the United States is required to distribute the Fund "according to criteria which it shall determine unilaterally, in its sole discretion." *Id.* at 11 (Agreement art. 6 § 1). Notwithstanding that discretion, the Agreement requires that, in making eligibility determinations, the United States "shall rely" on (1) an applicant's "sworn statement of nationality appearing in . . . the Annex to this Agreement," (2) her "sworn representation" regarding whether she has received (or is eligible to receive) funding from other programs that provide compensation for Holocaust deportation, and (3) "any relevant information obtained"

3

pursuant to information sharing between the United States and France. *Id.* at 11 (Agreement art. 6 § 2(c)). Significantly, the Agreement also includes a dispute resolution provision: "Any dispute arising out of the interpretation or performance of this Agreement shall be settled exclusively by way of consultation between the parties." *Id.* at 12 (Agreement art. 8).

In 2016, Albert Gutrejman, who is now deceased, filed a claim for compensation from the Fund. Dkt. 21 at 1 (Am. Compl. ¶ 1). Albert Gutrejman's mother, Estera, was "deported to Auschwitz on September 18, 1942, where she was killed." *Id.* at 3 (Am. Compl. ¶ 9). Estera's spouse and Albert Gutrejman's stepfather, Henri Gutrejman, died in 1976. *Id.* When Albert Gutrejman filed a claim for compensation, he did so as Henri Gutrejman's sole heir. *Id.* (Am. Compl. ¶ 10); *see id.* at 4–5 (Am. Compl. ¶ 14). As part of his application, Albert Gutrejman submitted a sworn affidavit that his stepfather was Romanian (and, thus, not French) and was married to his mother. *Id.* at 3–4 (Am. Compl. ¶¶ 11–12).

The State Department rejected Albert Gutrejman's claim, finding that he was ineligible for compensation because he had not provided "documentary evidence of the fact that his stepfather was Romanian." *Id.* at 3 (Am. Compl. ¶ 10). In rejecting the claim, the Department did not determine that Henri Gutrejman was a citizen of France; it noted only that Albert Gutrejman had failed to proffer adequate proof of Henri Gutrejman's nationality. *Id.*

The State Department premised its decision on a second rationale as well: Albert Gutrejman was "unable to provide a marriage certificate" for his stepfather to his mother. *Id.* at 4 (Am. Compl. ¶ 12). In lieu of a marriage certificate, Albert Gutrejman submitted what he characterizes as "a credible sworn statement about the marriage," which provided "the name of the rabbi" who performed the marriage ceremony "and the location of the shul" where the ceremony took place. *Id.* He also provided the Department with an affidavit from his attorney

4

"attesting to the fact that she had searched genealogical [sources] and contacted appropriate archives in France for evidence of the marriage" with no success. *Id.* (Am. Compl. ¶ 13). According to the attorney, "after the destruction [resulting from] World War II and the passing of more than 80 years, no such documents could be found." *Id.*

On January 31, 2020, Plaintiff Esther Gutrejman, as trustee of Albert Gutrejman's estate, filed this lawsuit against the United States under the FTCA. Dkt. 1. The Complaint alleged that the Department's rejection of Albert Gutrejman's claim was "a wrongful act." *Id.* at 6 (Compl. ¶ 23). The United States moved to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). Dkt. 12. After briefing on the motion concluded, Plaintiff filed a sur-reply in which she requested "the opportunity to amend [her] Complaint to supplement [her] allegations and to include a cause of action under the Administrative Procedure Act." Dkt. 18 at 3 n.2. On March 19, 2021, the Court granted the United States' motion to dismiss on the ground that Plaintiff's FTCA claim fell outside the scope of the FTCA's limited waiver of sovereign immunity. *See* Dkt. 20 at 13. The Court, however, granted Plaintiff leave to amend her complaint to raise a claim under the APA, 5 U.S.C. § 551 *et seq. Id.*

On April 16, 2021, Plaintiff filed her Amended Complaint, in which she alleges that the State Department's denial of Albert Gutrejman's claim was arbitrary and capricious in violation of the APA and "in violation of due process." Dkt. 21 at 5–6 (Am. Compl. ¶¶ 17, 20). Plaintiff now alleges that the Agreement "states that a declaration on one's honor as to nationality is sufficient to satisfy the requirements regarding citizenship," *id.* at 2 (Am. Compl. ¶ 2), and that the Department's rejection of Albert Gutrejman's claim for failure to provide "proof that [his stepfather] was a citizen of Romania" was "an exercise of discretion [that State] did not have," *id.* at 3 (Am. Compl. ¶ 10–11). According to Plaintiff, "[t]he language of the Agreement itself

5

was a mandate: for questions of nationality, the United States 'shall rely on the sworn statement of nationality.'" *Id.* at 3–4 (Am. Compl. ¶ 11). Thus, "[t]he affidavit which he signed and provided [was] in the form specifically required in accordance with the terms of the Agreement." *Id.* at 4 (Am. Compl. ¶ 11). In addition, Plaintiff alleges that "[the Department] has also arbitrarily and capriciously refused to accept basic principles of evidence" because "the Federal Rules of Evidence permit the admissibility of sworn affidavits by persons having personal knowledge of the facts." *Id.* at 5 (Am. Compl. ¶ 16). Plaintiff seeks to have the Department's decision "overturned" and for the Court to "declare[] [Plaintiff] eligible to receive compensation from the Holocaust Deportation Fund." *Id.* at 6 (Am. Compl. ¶¶ 20, 23).

The United States moves to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). For the following reasons, the Court will **GRANT** the United States' motion and will **DISMISS** Plaintiff's Amended Complaint for lack of subject-matter jurisdiction.

## II. LEGAL STANDARD

The government's motion to dismiss implicates two legal standards. First, a motion to dismiss under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction to hear the claim. The plaintiff bears the burden of establishing jurisdiction, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and "subject matter jurisdiction may not be waived," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) (quotation marks omitted). Where, as here, a defendant contends that the jurisdictional allegations in the complaint are inadequate, the Court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor" but does not "assume the truth of legal conclusions." *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (quotation marks omitted). In this sense,

6

the Court must resolve the motion in a manner similar to a motion to dismiss under Rule 12(b)(6).  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim to relief,' and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)).  The complaint, however, need not include "detailed factual allegations" to withstand a Rule 12(b)(6) motion.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is . . . unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Id.* at 555–56 (quotation marks omitted).

For purposes of both Rule 12(b)(1) and Rule 12(b)(6), the Court may consider the Agreement, which forms a cornerstone of the Amended Complaint, is undisputed, and, in any event, is subject to judicial notice.  *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 & n.3 (D.C. Cir. 1997).

### III.  DISCUSSION

The government raises four arguments in support of its motion to dismiss, all of which posit that the State Department's interpretation and enforcement of the Agreement are not

subject to judicial challenge. Although a common thread runs through each of the government's arguments, they turn on distinct doctrines and implicate different juridical considerations.

First, the government contends that Plaintiff's APA claim "raise[s] a non-justiciable political question." Dkt. 23-1 at 23. As Chief Justice Marshall wrote in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court," *id.* at 170. In the government's view, Plaintiff's APA claim is "political" in nature because it asks the Court to "oversee the [State] Department's interpretation and implementation of an international agreement" that is not self-executing and would, thus, "clearly involve[]" the Court in determinations of foreign policy. Dkt. 23-1 at 28–29. By doing so, the government continues, the Court would not only intrude on a field constitutionally committed to the political branches but would also "express a lack of respect for the Executive's foreign policy determination that the Holocaust deportation claims should be resolved extra-judicially." *Id.*

Second, the government argues that the Agreement itself precludes judicial review under the APA. Although the APA "suppl[ies] a generic cause of action in favor of persons aggrieved by agency action," *Md. Dep't of Human Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985), courts lack jurisdiction to hear APA claims "to the extent . . . statutes preclude judicial review." 5 U.S.C. § 701(a); *see also Webster v. Doe*, 486 U.S. 592, 599 (1988) ("Section 701(a) . . . limits application of the entire APA to situations in which judicial review is not precluded by statute."). According to the government, the Agreement's requirement that "[a]ny dispute arising out of the interpretation or performance of this Agreement shall be settled *exclusively* by way of consultation between the parties" prevents the Court from hearing

8

Plaintiff's APA claim.  Dkt. 23-2 at 12 (Agreement art. 8) (emphasis added); *see also* Dkt. 23 at 19–20.

Third, on the merits, the government argues that "the Agreement does not create a private cause of action" because it "contains no express provisions creating judicially enforceable rights."  Dkt. 23-1 at 15–18.  Although the APA provides a cause of action to challenge final agency actions, the government maintains that more is needed when a plaintiff seeks to enforce an executive agreement—the Agreement itself must create a private cause of action.  *Id.* at 16 (citing *De La Torre v. United States*, Civ. Action No. 02-1942, 2004 WL 3710194, at *8–9 (N.D. Cal. 2004)).  The government argues that the Agreement does not create "judicially enforceable rights" because it is "not self-executing," and, "even if [it] were self-executing, there is no private right of action" because there is no "evidence that [the Agreement] was intended to be privately enforceable."  *Id.* at 16 n.4, 17.

Finally, and again on the merits, the government argues that the Department's denial of Albert Gutrejman's application constitutes "agency action . . . committed to agency discretion by law" and is thus unreviewable under the APA, 5 U.S.C. § 701(a)(2).  Dkt. 23-1 at 20–23.  In cases where "no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for abuse of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Here, because the Agreement provides that the United States "shall distribute the [Fund] according to criteria which it shall determine unilaterally, in its sole discretion," Dkt. 23-2 at 11 (Agreement art. 6 § 1), the government maintains that there are no judicially manageable standards for the Court to apply in determining whether the Department's action was arbitrary and capricious, Dkt. 23-1 at 21.

9

Because the Agreement is non-self-executing and limits dispute resolution to the diplomatic process, the Court has little difficulty concluding that the Amended Complaint must be dismissed. The difficulty, however, lies in determining whether the Court should dismiss the action for lack of jurisdiction or on the merits. It is, of course, a bedrock principle that Article III courts must, except under unusual circumstances, resolve jurisdictional defenses before turning to the merits of a dispute. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). But applying that principle here is no easy task.

The Court starts with the government's Section 701(a)(1) argument, which is arguably jurisdictional. Section 701(a)(1) renders the APA applicable, "except to the extent that . . . a statute precludes judicial review." 5 U.S.C. § 701(a)(1). But, as the D.C. Circuit has stressed, "the APA does not confer jurisdiction," *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006); rather, in most APA cases, jurisdiction is conferred on the federal courts under 28 U.S.C. § 1331. To be sure, when another, more specific statute precludes judicial review—thus narrowing the scope of Section 1331—that limitation is typically jurisdictional. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 353 n.4 (1984); *Amador Cnty. v. Salazar*, 640 F.3d 373, 380 (D.C. Cir. 2011). The Court is unpersuaded, however, that a sole executive agreement can divest federal courts of federal-question jurisdiction or that Section 701(a)(1) confers such jurisdiction-limiting authority on the executive. To start, it goes without saying that a sole executive agreement cannot amend a statute, and thus the Agreement at issue in this case cannot narrow the scope of Section 1331, thereby divesting Article III courts of federal-question jurisdiction. And, consistent with the understanding that only Congress can amend a jurisdiction-conferring statute, Section 701(a)(1) applies only if "a *statute* precludes judicial review." 5 U.S.C. § 701(a)(1) (emphasis added).

Because the government's only other jurisdictional defense rests on the political question doctrine, *see Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017) (explaining that the political question doctrine is jurisdictional and thus, "the Court must address it *before* proceeding to the merits" (quotation marks omitted)); *Al-Tamimi v. Adelson*, 916 F.3d 1, 7–8 (D.C. Cir. 2019) (same), the Court must confront the "'nebulous'" question of "[j]ust where the non-justiciability line is drawn," *Schieber v. United States*, Civil Action No. 21-1371, 2022 WL 227082, at *5 (D.D.C. Jan. 26, 2022) (alteration in original) (quoting *Gonzalez-Vera v. Kissinger*, Civil Action No. 02-2240, 2004 WL 5584378, at *3–4 (D.D.C. Sept. 17, 2004)); *see also Faktor v. United States*, Civil Action No. 20-263, 2022 WL 715217 at *4 (D.D.C. Mar. 10, 2022). Application of that doctrine is further complicated in this case because application of the (jurisdictional) political question doctrine defense overlaps with the government's (non-jurisdictional) merits defenses. That problem, however, is addressed by the Supreme Court's recent observations (1) that "the 'merits and jurisdiction will sometimes come intertwined,'" and (2) that, when the merits and jurisdiction overlap, a court may resolve the merits of a dispute "in resolving a jurisdictional question, or vice versa." *Brownback v. King*, 141 S. Ct. 740, 749 (2021) (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017))). When that happens, moreover, "a ruling that the court lacks subject-matter jurisdiction may simultaneously be a judgment on the merits." *Id.* This, then, leads the Court full circle; the Court must resolve a jurisdictional defense (the government's political question doctrine defense) before resolving the two merits defenses (the government's lack of a private cause of action and committed to agency discretion defenses), but the Court's resolution of that jurisdictional defense will require the Court to address the merits as well.

The political question doctrine, as its name suggests, is "designed to restrain the Judiciary from inappropriate interference in the business of other branches"—that is, the so-called "political" branches. *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). In *Baker v. Carr*, the Supreme Court identified six hallmarks of nonjusticiable political questions:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 2017 (1962). Although "to find a [nonjusticiable] political question" the Court "need only conclude that one factor is present," *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005), the government maintains that "decid[ing] Plaintiff's claim would . . . implicate the first, second, fourth, and sixth *Baker* factors." Dkt. 23-1 at 29 (emphasis omitted). In particular, according to the government, resolution of Plaintiff's APA claim would involve the Court in "foreign policy" judgments that are "committed to the executive;" "it would express a lack of respect for the Executive's foreign policy determination that the Holocaust deportation claims should be resolved extra-judicially using solely the executive mechanism of the claims process established under the Agreement;" it "would interfere with the foreign policy objectives of providing an expeditious, non-judicial, exclusive process to address certain Holocaust-deportation related claims;" it "could undermine the President's conduct of foreign affairs" and could "lead to differing pronouncements from the various branches on the same question;" and it "could impact future claim settlement agreements if it appears that the executive branch does not have the final word on claim settlement." *Id.* at 29–30.

12

As the Supreme Court has cautioned, "it is error to suppose that every case or controversy which touches on foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. But, by the same token, "[t]he political question doctrine is essentially a function of the separation of powers," *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir 2010) (internal quotations omitted), and the Court must respect the constitutional bounds of the separation of powers.  In the present context, moreover, those bounds coincide with the bounds of the Agreement and the question whether it creates any judicially enforceable rights.  If it does not, then the Court risks not only intruding in the field of foreign affairs, which is entrusted to the political branches, but it risks aggrandizing the role of the judiciary, which can only enforce the law as prescribed by the Constitution and the political branches.

The concept of non-self-execution, like the political question doctrine, asks whether the Agreement "addresses itself to the political, *not* the judicial department." *Medellín v. Texas*, 552 U.S. 491, 516 (2008) (quoting *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 317 (1829)).  By the same token, the APA's judicial review provisions, although statutory in nature, call upon the Court to consider whether the Agreement contemplates judicial resolution of disputes and sets standards "against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830.  The jurisdictional and merits questions presented in this case thus both turn on a single inquiry: whether the Agreement is judicially enforceable or whether its interpretation and enforcement are committed to the diplomatic process—in which courts play no part.  As the Ninth Circuit explained in resolving a similar dispute, "[w]hether examined under the rubric of treaty self-execution . . . or the political question doctrine, the analysis stems from the same separation-of-powers principle—enforcement of [a non-self-executing agreement] is not committed to the

13

judicial branch." *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1192 (9th Cir. 2017).[2]

The Court concludes that the Agreement is not judicially enforceable and that Plaintiff's claims are thus nonjusticiable. For that conclusion, the Court need only look to its recent decision in *United States v. Sum of $70,990,605* ("*$70 Million*"), 234 F. Supp. 3d 212 (D.D.C. 2017). There, the Court considered whether an executive agreement—the Bilateral Security Agreement between Afghanistan and the United States—was judicially enforceable in the context of an *in rem* action seeking forfeiture of assets held at U.S. banks. *Id.* at 216–17. The Afghanistan-U.S. agreement contained a dispute resolution provision stating: "Any divergence in views or dispute regarding the interpretation or application of this Agreement shall be resolved through consultations between the Parties and shall not be referred to any national or international court, tribunal or other similar body, or any third party for settlement." *Id.* at 233. The Court held that the agreement was not enforceable in U.S. courts because the "dispute resolution provision . . . commit[ted] any dispute 'regarding the interpretation or application' of the agreement solely to diplomatic channels." *Id.* at 235. In so holding, the Court applied the principle set forth in *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972), that "'when the corrective machinery specified in the [agreement] itself is nonjudicial,' the U.S. courts are without power to act." *$70 Million*, 234 F. Supp. 3d at 235 (quoting *Holmes*, 459 F.2d at 1222).

---

[2] In that case, the Marshall Islands sued the United States, seeking a declaratory judgment that the United States was in breach of certain treaty obligations and an order requiring that the United States take certain steps to attain compliance. *Republic of Marshall Islands*, 865 F.3d at 1190. In moving to dismiss the case, the government argued (1) that Plaintiff lacked Article III standing, (2) that the case raised nonjusticiable political questions, and (3) that Article VI of the treaty was not self-executing and thus "not directly enforceable in domestic courts." *Id.* at 1191. The district court granted the motion on the first two grounds. *Id.* On appeal, the Ninth Circuit affirmed without confining itself to one doctrinal category, merely holding that the claims were nonjusticiable. *Id.* at 1192.

Applying that principle here, the Court concludes that the France-U.S. Agreement is not judicially enforceable.  Article 8 of the Agreement provides that "[a]ny dispute arising out of the interpretation or performance of this Agreement shall be settled *exclusively* by way of consultation between the parties."  Dkt. 23-2 at 12 (Agreement art. 8) (emphasis added).  That provision closely resembles the dispute resolution provision that the Court considered in *$70 Million*.  To be sure, the two dispute resolution provisions differ in that the Afghanistan-U.S. agreement made specific reference to courts, while the Agreement in this case does not.  But Article 8 of the France-U.S. Agreement treats diplomatic consultation as the "exclusive[]" mechanism for resolving any disputes arising out of the Agreement's interpretation or performance.  Thus, like the agreement at issue in *$70 Million*, the France-U.S. Agreement "could not be clearer:" any dispute regarding "the interpretation . . . of [the] Agreement" must occur through "diplomatic recourse."  *$70 Million*, 234 F. Supp. 3d at 235 (quoting *Holmes*, 459 F.2d at 1222).  Plaintiff's challenge to the State Department's interpretation (or enforcement) of the Agreement's requirements for determining Fund eligibility is such a dispute.  Plaintiff's claims are, accordingly, nonjusticiable.

In an effort to avoid this logic, Plaintiff argues in her opposition brief that she is not "ask[ing] the Court to change or interpret any terms of the Agreement."  Dkt. 24 at 4.  To the contrary, according to Plaintiff, "all [she] is seeking" is "to have the Defendant accept affidavits sworn under penalty of perjury."  *Id.* at 12.  Among other difficulties, this characterization of Plaintiff's claims is belied by her own allegations.  In the Amended Complaint, Plaintiff asks the Court to interpret the Agreement and to determine whether the State Department acted contrary to its terms.  Dkt. 21 at 3–4, 6 (Am. Compl. ¶¶ 11, 17).  The crux of Plaintiff's claim is as follows:

15

> When the State Department rejected Mr. Gutrejman's sworn affidavits of nationality, it was an exercise of discretion which it did not have. *The language of the Agreement itself was a mandate*: for questions of nationality, the United States "shall" rely on the sworn statement of nationality." The use of the word "shall" instead of "may" makes clear that it is not a discretionary decision whether an affidavit will be accepted. . . . In the original claim form, Albert Gutrejman swore that the information in the application, including the information that his stepfather was Romanian, was true and correct. The affidavit which he signed and provided is in the form specifically required *in accordance with the terms of the Agreement*.
>
> \* \* \*
>
> *The Agreement requires* that [a] claimant's statements of nationality in declarations of honor be accepted. Sworn affidavits provided by Mr. Gutrejman are sufficient to satisfy those requirements. *The Agreement also requires* State to take in to account *the objectives of the Agreement*, including in the first instance providing expeditious compensation to Holocaust deportation victims and families. State's apparent determination that it simply does not believe Albert Gutrejman's sworn statements without any evidence to impeach his assertions, *violates both the spirit and the language of the Agreement*. For these reasons, the denial of Albert Gutrejman's claim is arbitrary and capricious and violates due process owed to him.

*Id.* (emphasis added). The issue raised in the operative complaint, accordingly, is whether the Agreement, by its terms, required the Department to accept the evidence submitted with Albert Gutrejman's claim for compensation from the Fund and to approve his application. It is, in other words, a "dispute arising out of the interpretation or performance of th[e] Agreement," Dkt. 23-2 at 12 (Agreement art. 8), and the Agreement reserves resolution of such a dispute to diplomatic consultation between France and the United States.

Nor could Plaintiff avoid this difficulty by amending her complaint for a second time. The scope of the provision reserving dispute resolution to diplomatic channels sweeps as broadly as the compensation program itself; it requires the parties—that is, the United States and the French Republic—to resolve any and all disputes "arising out of the interpretation or performance of [the] Agreement" through "consultation between the Parties." Dkt. 23-2 at 12

16

(Agreement art. 8).  Thus, even accepting Plaintiff's re-characterization of her complaint as merely challenging the form of evidence that the State Department was willing to consider, her claim, at the very least, arises out of the *performance* of the Agreement.

Moreover, even if the Agreement did not expressly commit dispute resolution to the diplomatic process, Plaintiff would encounter a related hurdle: the Agreement does not bestow any private rights on Fund applicants.  As the Supreme Court has emphasized, there is a "background presumption" that "international agreements, even those directly benefiting private persons, generally do not create private rights."  *Medellín*, 552 U.S. at 506 n.3 (quoting Restatement (Third) of Foreign Relations Law of the United States § 907 cmt. a (Am. L. Inst. 1986)); *see also $70 Million*, 234 F. Supp. 3d at 237–38.  Absent "express language to the contrary," that background presumption precludes individuals from seeking to enforce international agreements in court.  *Medellín*, 552 U.S. at 506 n.3.  Here, there is no basis to conclude that the Agreement creates private rights.  To the contrary, the Agreement makes clear that the United States shall distribute the Fund "in its sole discretion" according to "criteria which it shall determine unilaterally."  *Id.* at 11 (Agreement art. 6 § 1).  As a result, even if the Agreement were judicially enforceable, Plaintiff's claims would fail.  To conclude otherwise would require the Court to ignore the choice made by the U.S. executive branch and France to enter an agreement that is non-self-executing and that does not so much as hint at the creation of privately enforceable rights.

Plaintiff counters that her claims are justiciable because she brings them under the APA, rather than under the Agreement itself.  Dkt. 24 at 3.  Citing to the APA's generic cause of action, *see* 5 U.S.C. § 702, Plaintiff maintains that "the basic presumption of judicial review" under the APA applies unless the United States can identify "a particular statute preclud[ing]

17

review or . . . agency action is committed to agency discretion by law" under the APA § 701(a). Dkt. 24 at 7. According to Plaintiff, "Defendant has not identified any such law—either to prohibit review or to grant unfettered discretion." *Id.* The Agreement, says Plaintiff, "is not a statute enacted by the legislative branch[;] it is not even a treaty." *Id.* Rather, "it is an executive agreement and no provision of that document precludes judicial review." *Id.*

The Court cannot agree with the premise that the presumption of judicial review applies whenever a plaintiff files an APA claim to enforce an international agreement. If an agreement is not judicially enforceable—if, in other words, its enforcement is committed to the exclusive province of the political branches—then the Court lacks the power to hear claims arising out of the agreement, irrespective of the statutory vehicle that a plaintiff relies upon to bring a cause of action. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842–43 (D.C. Cir. 2010) (en banc) ("[A] statute providing for judicial review does not override Article III's requirement that federal courts refrain from deciding political questions."). Were it otherwise, the APA would present a convenient workaround for presenting claims in court that would, in the absence of an APA claim, be nonjusticiable under one of the doctrines discussed above.

The D.C. Circuit rejected Plaintiff's very argument in *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929 (D.C. Cir. 1988). There, the plaintiffs claimed that the United States' funding of the Nicaraguan Contras violated a judgment of the International Court of Justice ("ICJ"), *id.* at 932, and they asserted, among other things, a cause of action under the APA, *id.* at 942. The D.C. Circuit, however, held that the international law governing ICJ judgments (incorporated by reference into the U.N. Charter) did not "vest citizens . . . with authority to enforce an ICJ decision against their own government," and, therefore, the plaintiffs' claims were not "cognizable in domestic courts." *Id.* at 938. Recognizing that the

plaintiffs also brought claims under the APA, the D.C. Circuit rejected those claims for the same reasons, holding that the plaintiffs' arguments were "foreclosed both by the nature of ICJ judgments and by the scope of the APA." *Id.* at 942. As the D.C. Circuit explained, "[i]n theory, a law such as the APA could supersede these limitations in the [U.N. Charter], transforming ICJ decisions into legal standards for domestic judicial review." *Id.* at 942–43. But "the APA does not possess such generative capacity." *Id.* at 943. Accordingly, the D.C. Circuit concluded that "the APA does not grant judicial review of agencies' compliance with a legal norm that is not otherwise an operative part of domestic law." *Id.*

      The Court is bound to apply the D.C. Circuit's reasoning here: because the Agreement is not "an operative part of domestic law," Plaintiff cannot rely upon the APA to "supersede [its] limitations." *Id.* at 942–43. That principle, moreover, resolves both the threshold jurisdictional question and the merits. The Agreement does not contemplate a role for the federal courts but, rather, adopts a diplomatic solution to a controversy between nations. It did not create any enforceable domestic law, and it expressly eschewed a judicial remedy. The Court would violate the separation of powers—and thus the political question doctrine—to introduce a role for the courts, and it would bestow a non-existent right by recognizing a private right of action to enforce the Agreement in U.S. courts. In the field of foreign affairs, the political branches are allowed (subject to constitutional limitations not implicated here) to adopt purely diplomatic solutions for international disputes, and the courts must respect those decisions.

      The Court will, accordingly, dismiss the Amended Complaint for lack of jurisdiction.[3]

---

[3] Plaintiff also alleges that the State Department's denial of Albert Gutrejman's claim violated "due process." Dkt. 21 at 6 (Am. Compl. ¶¶ 17, 20). The nature of Plaintiff's due process claim is not entirely clear from the face of the Amended Complaint, and Plaintiff does not address it in her opposition brief. The Court concludes, nonetheless, that Plaintiff's due process claim, to the extent she pursues one, falls short for failure to allege a cognizable liberty or property interest.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the United States' motion to dismiss, Dkt. 23, is **GRANTED** and that Plaintiff's Amended Complaint is **DISMISSED** without prejudice.

A separate order will issue.

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date: March 22, 2022